MID–AMERICA REGIONAL BARGAIN-
ING ASSOCIATION, et al.,
Plaintiffs-Appellants,

v.

WILL COUNTY CARPENTERS
DISTRICT COUNCIL, et al.,
Defendants-Appellees.

No. 81–1442.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 2, 1981.

Decided April 13, 1982.

Charles E. Murphy, Vedder, Price, Kauf-
man & Kammholz, Chicago, Ill., for plain-
tiffs-appellants.

Paul W. Schroeder, Isham, Lincoln &
Beale, Chicago, Ill., for defendants-appel-
lees.

Before SPRECHER and WOOD, Circuit Judges, and BROWN, Senior District Judge.*

SPRECHER, Circuit Judge.

This case concerns the scope of the labor exemptions to the federal antitrust laws. Here, contractors and their trade associations claimed that an alleged agreement between a union, a contractor, and a public utility violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Because we find that the acts alleged fall within both the "statutory" and "nonstatutory" labor exemptions we affirm the district court's dismissal of the complaint.

I

The plaintiffs are three trade associations ("the Trade Associations") and two private contractors ("the Contractors"). The defendants are the Will County Carpenters District Council ("the union"), its international, Commonwealth Edison ("Edison"), and the Gust K. Newberg Construction Company ("Newberg"). The action stems from a labor dispute in Will County during the summer of 1979.

The Trade Associations represented most construction contractors in Will County and had traditionally negotiated a collective bargaining agreement with the union's construction workers which became the standard for all Will County contractors. In 1979, however, the Trade Associations and the union could not agree on contract terms prior to the termination of the existing contract. Soon after the contract expired, the union directed its members to engage in selective picketing and strikes against certain contractor members of the Trade Associations. The Trade Associations responded to this action by directing all their members to engage in a defensive lockout of the union.

At this time, Newberg was engaged in construction for Edison on a nuclear generating station under construction in Braidwood, Illinois, and an existing generating facility in Romeoville, Illinois. Although Newberg was not a member of any of the Trade Associations, these projects were, nevertheless, subject to the strikes and lockouts.

Edison allegedly moved to prevent work stoppage on the projects by entering into an agreement with the union whereby Edison would "pressure" Newberg, as well as its other contractors, into paying into an escrow account $2.25 per employee for each hour worked during the strike.[1] The contractors were to pay this money into the account for all work done since the expiration of the previous contract, and the funds were to be released in accordance with any collective bargaining agreement negotiated by the union and the Trade Associations.[2] Edison agreed to compensate its contractors for this expense. Newberg employed approximately twenty-five per cent of the Will County union carpenters on its Edison projects, and these workers returned to work after the escrow agreement was reached. Approximately four weeks later, on August 20, the Trade Associations and the union agreed to a $2.25 per hour minimum wage increase retroactive to June 1, 1979.

The plaintiffs then brought this action in district court.[3] The complaint alleged that

---

* Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1. Edison's other contractors, who were members of one of the Trade Associations, were not named as defendants, although they too are alleged to have participated in the escrow agreement.

2. The amount paid to the escrow account was in addition to the existing wage scale. Thus, if the agreement ultimately reached between the union and the Trade Associations called for a $1.25 per hour wage increase, that amount would be paid out of the escrow fund, with the remainder returned to the contractor.

3. One of the trade associations first filed a complaint with the National Labor Relations Board alleging that the district union had failed to bargain in good faith. This claim was rejected by the Board. Letter from Alex V. Barbour, Regional Director, to Charles E. Murphy (Sept. 6, 1979) (Re: Carpenters District Council of

the defendants had violated Section 1 of the Sherman Act, tortiously interfered with contractual relations between the Trade Associations and their members, and engaged in a civil conspiracy to interfere with these contractual relations.

The plaintiffs' Section 1 claim asserted that by entering into the escrow agreement, the defendants undercut the bargaining position of the Trade Association, thus forcing them to pay a retroactive wage equal in amount to that deposited in the escrow account. This amount, the complaint alleged, was artificially high, since it was subsidized by Edison which, as a public utility, was insulated from competition. Thus, the agreement was a combination, contract or conspiracy which imposed a wage scale that would injure the contractors, and which interfered with the "rights" of the Trade Associations to engage in collective bargaining.

Defendants Edison and Newberg moved to dismiss the complaint, and the district court granted this motion on February 11, 1981. The court found that the only direct restraint alleged in the complaint was a restraint in the market for human labor. Such a restraint, the court found, is exempt from antitrust scrutiny under the "labor exemption" created by sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and sections 4, 5 and 13 of the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105 and 113. The court ruled, therefore, that the complaint failed to state a claim upon which relief could be granted.[4] The plaintiffs challenge this ruling on appeal.

## II

In reviewing the dismissal of a complaint, "the well-pleaded factual allegations of the complaint are taken as true." *Ashbrook v. Hoffman*, 617 F.2d 474, 475 (7th Cir. 1980). *Accord, Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). A dismissal will be upheld only "if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Ashbrook v. Hoffman*, 617 F.2d 474, 475 (7th Cir. 1980). The court, however, "is not required to accept legal conclusions that may be alleged or that may be drawn from the pleaded facts." *Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 432 (7th Cir. 1978) (citations omitted). Furthermore, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981). *Accord, Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 973 (8th Cir. 1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969) ("In testing the legal sufficiency of the complaint . . . conclusions of law and unreasonable inferences or unwarranted deductions of fact are not admitted."). An examination of the plaintiffs' complaint in light of these standards demonstrates that the district court properly dismissed the complaint.[5]

We begin with an examination of the history of the labor exemptions. Because this history has been told in detail else-

Will County and Vicinity (Mid-America Regional Bargaining Association) Case 13–CB–8611).

4. The court's opinion did not explain its dismissal of the state claims. However, as the defendants demonstrated in their briefs to the district court, dismissal of the state claims for lack of pendent jurisdiction was appropriate once the Sherman Act claim was dismissed. *UMW v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The plaintiffs do not challenge this aspect of the decision on appeal.

5. We recognize that the Supreme Court in *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), cautioned against summary dismissal of antitrust claims, but we do not read *Poller* to require that we ignore Rule 12(b)(6) of the Federal Rules of Civil Procedure in the context of antitrust claims. "[I]f the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility." *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 553 (7th Cir. 1980). *Accord, Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1167 (7th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

where,[6] our sketch can be brief. Following passage of the Sherman Act in 1890, the courts found labor to be a commodity or article of commerce under the Sherman Act, and applied the Act to invalidate the collective bargaining agreements achieved by labor unions. *See, e.g., Loewe v. Lawlor*, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908); *United States v. Workingmen's Amalgamated Council*, 54 Fed. 994 (C.C.E. D.La.), *aff'd*, 57 Fed. 85 (5th Cir. 1893). In response, Congress sought to specifically exempt labor union activity by enacting sections 6 and 20 of the Clayton Act. 15 U.S.C. § 17 and 29 U.S.C. § 52. Passage of the Clayton Act, however, failed to achieve this end, for the courts continued to apply the Sherman Act to union activities. *See, e.g., Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association*, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927); *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921); *Alco Zander Co. v. Amalgamated Clothing Workers*, 35 F.2d 203 (E.D.Pa.1929). Congress, therefore, enacted the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, which sought to exempt labor activities from the application of various statutes. *See United States v. Hutcheson*, 312 U.S. 219, 235–36, 61 S.Ct. 463, 467–68, 85 L.Ed. 788 (1941). The Clayton and Norris-LaGuardia Acts combined to provide a comprehensive exemption from antitrust liability for union activity.

In cases decided since the enactment of the Norris-LaGuardia Act, courts have defined the parameters of the labor antitrust exemption. As noted by the Supreme Court in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–35, 44 L.Ed.2d 418 (1975), this has resulted in two distinct exemptions to the antitrust laws—a statutory exemption based on various sections of the Clayton and Norris-LaGuardia Acts, and a nonstatutory exemption based on an "accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets." *Id.* at 622, 95 S.Ct. at 1835.[7] We turn, therefore, to an examination of each of these exemptions to demonstrate that either one provided a sufficient basis for the district court's dismissal of the plaintiffs' complaint.[8]

A

The statutory labor exemption stems from the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-LaGuardia Act. 29 U.S.C. §§ 104, 105, and 113. *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–35, 44 L.Ed.2d 418 (1975). Section 6 of the Clayton Act, 15 U.S.C. § 17, provides:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or

---

**6.** *See, e.g.*, Meltzer, *Labor Unions, Collective Bargaining and the Antitrust Laws*, 32 U.Chi.L. Rev. 659, 662–66 (1965); Winter, *Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities*, 73 Yale L.J. 14, 30–38 (1963); Cox, *Labor and the Antitrust Laws—A Preliminary Analysis*, 104 U.Pa.L.Rev. 252 (1955).

**7.** Although the statutory and nonstatutory exemptions thus appear to be based on separate and distinct statutes, " '[a]ll the major cases involving labor's antitrust exemption have purported to accommodate the Clayton, Norris-LaGuardia, Wagner, and Sherman Acts.' " *Smit-*

ty Baker Coal Co. v. UMW, 620 F.2d 416, 423 n.14 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980) (quoting *The Supreme Court, 1974 Term*, 89 Harv.L.Rev. 47, 236 n.13 (1975)).

**8.** The district court did not analyze the case in terms of statutory and nonstatutory exemptions. However, "[i]t is well settled that on appeal a litigant is entitled to rely on any ground for affirmance, whether or not passed upon by the trial court." *City of Milwaukee v. Saxbe*, 546 F.2d 693, 704 (7th Cir. 1976).

construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

Section 20 of the Act prohibits the courts from enjoining specified acts by employees that occur in the course of disputes "concerning terms or conditions of employment," and states that these acts cannot be "held to be violations of any law of the United States." 29 U.S.C. § 52.

The Norris-LaGuardia Act further expands the intended scope of the labor exemption. The Act prohibits injunctions against employees engaged in various activities during a labor dispute, even where a claim is made of an unlawful combination or conspiracy.[9] The right to bargain collectively is specifically protected.[10] Although the Act does not by its terms provide a labor exemption from antitrust laws, "it has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes." *H. A. Artists & Associates v. Actors' Equity Association*, 451 U.S. 704, 714, 101 S.Ct. 2102, 2109, 68 L.Ed.2d 558 (1981). *See* L. Sullivan, Handbook of the Law of Antitrust 723 (1977).

The statutory exemption was first interpreted by the Supreme Court in *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).[11] There, the Court rejected the claim that a union had violated the Sherman Act by, *inter alia*, inducing other unions to cease working for the em-

ployer with which the defendant union had a labor dispute. The Court found that Congress' intent in enacting the Norris-LaGuardia Act was to preclude not only injunctions against specified union activities in labor disputes, but Sherman Act liability for those activities as well. *Id.* at 234–35, 61 S.Ct. at 467. The Court enunciated a broad scope for the labor antitrust exemption:

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.* at 232, 61 S.Ct. at 466 (footnote omitted).

In *Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the Court applied its *Hutcheson* formulation to find that the statutory exemption had been forfeited because the union defendant had conspired with employers to restrain trade. *Id.* at 809, 65 S.Ct. at 1539. In *Allen Bradley*, the plaintiffs were manufacturers of electrical equipment, manufacturing outside of New York City. The defendant was the local union representing electrical workers in New York City. The plaintiffs challenged an industry-wide

---

**9.** A labor dispute is defined by the Act as including "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c).

**10.** 29 U.S.C. § 102 provides:
Whereas under prevailing economic conditions ... the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of

his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purposes of collective bargaining or other mutual aid or protection
. . . .

**11.** Although the Court in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), examined the Clayton and Norris-LaGuardia Act provisions, the Court's decision in that case appears to have rested upon a determination that the conduct did not violate the terms of the Sherman Act. Thus, it was not necessary to examine the statutory exemption.

agreement negotiated by the union which provided that contractors would purchase equipment only from New York City electrical manufacturers, and the manufacturers would only sell to contractors employing union members. Although the union was acting in its own self-interest, there was substantial evidence that it had conspired with non-labor entities. The Court noted that this evidence extended beyond the collective bargaining agreement which, "standing alone, would not have violated the Sherman Act." *Id.*[12] The Court, therefore, found that the union had forfeited its statutory exemption.

As *Hutcheson* and *Allen Bradley* demonstrate, the central questions to be asked in determining whether the plaintiffs' complaint in this case alleged conduct not covered by the statutory labor exemption are whether the union acted in its own self-interest and whether a conspiracy between the union and a non-labor entity was properly pleaded. The plaintiffs concede that the agreement they allege between the district union and Newberg was in the union's self-interest. They claim that the agreement served to achieve an "artificially high wage increase," certainly a result that is in the union's interest. Thus, if the defendants' conduct is to fall outside the statutory exemption, the plaintiffs must allege a conspiracy under *Allen Bradley*. We find that the plaintiffs failed to properly plead such a conspiracy. While the plaintiffs' complaint uses the word "conspiracy" repeatedly, it cannot fairly be read to remove the alleged conduct from the reach of the statutory exemption.

Essentially, the plaintiffs seek to infer a conspiracy between Edison, Newberg and the union on the basis of the escrow agreement reached between the contractors and the union. Yet, more than this is needed to plead a conspiracy that would remove the alleged agreement from the coverage of the labor exemption.[13]

Where plaintiffs base claimed conspiracies solely upon the existence of a collective bargaining agreement concerning subjects of mandatory bargaining,[14] courts have

---

**12.** The Supreme Court made it clear in *Local 24, Int'l Bhd. of Teamsters v. Oliver*, 358 U.S. 283, 296, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959), that *Allen Bradley* was intended to set only "outside limits" on the normal rule that agreements reached concerning subjects of mandatory bargaining cannot lead to liability for violation of laws. The Court noted that such an approach was necessary to further the congressional policy "as expressed in the Wagner and Taft-Hartley Acts" of the "promotion of collective bargaining." *Id.* at 295, 79 S.Ct. at 304.

**13.** While the plaintiffs' complaint could be read to allege the existence of a conspiracy apart from the escrow agreement, such a reading would not be justified. The only factual assertion supporting the plaintiffs' conspiracy claim is the existence of the escrow agreement. The balance of the complaint simply infers a conspiracy from the existence of that agreement and alleges that it was entered into pursuant to "a conspiracy." This is insufficient, however. Mere "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981). *See Larry R. George Sales Co. v. Coal Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979) ("A general allegation of conspiracy ... without a statement of the facts constituting the conspiracy, is a mere allegation of a legal conclusion and is inadequate of itself to state a cause of action. The pleader must allege the facts constituting the conspiracy, its object and accomplishment.").

**14.** Although the alleged "escrow agreement" between Newberg and the district union was not, strictly speaking, a collective bargaining agreement, the cases discussed herein are nevertheless applicable. The agreement, allegedly reached was quite similar to a traditional collective bargaining agreement: it was between an employer and the collective bargaining agent of its employees over a subject of mandatory bargaining—wages. The fact that the final wage was not final, but rather was dependent on an external factor—the size of the wage increase granted by the Trade Associations—does not deprive it of that character. The cases holding that a collective bargaining agreement should not serve as the sole evidence of a conspiracy do not focus upon the formal requirements of a collective bargaining agreement. Rather, they focus upon the inappropriateness of basing a finding of antitrust conspiracy on an agreement reached as a result of the collective bargaining *process* commanded by the labor laws. A narrower reading of these cases would do substantial damage to the Norris-LaGuardia Act's goal of "full freedom ... to negotiate the terms and conditions of ... employment," 29 U.S.C. § 102, as well as the National Labor Relations Act's goal of re-

generally held that these allegations are insufficient to remove the statutory exemption from union conduct.[15] "The mere combination by a union with 'non-labor groups' does not violate the Sherman Act. To hold otherwise would invalidate collective bargaining." *Bodine Produce, Inc. v. United Farm Workers Organizing Committee*, 494 F.2d 541, 558 (9th Cir. 1974).

In *UMW v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), small mine operators brought an antitrust action against the coal miners' union. The basis of the complaint was that large employers and the union had entered into an industry-wide collective bargaining agreement that imposed a wage scale that small operators would be unable to pay. The plaintiffs claimed that this had been done for the purpose of driving them out of business.

■ The Court began its analysis by noting, in keeping with *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941), that it is "beyond question that a union may conclude a wage agreement with the multi-employer bargaining unit without violating the antitrust laws and that it may as a matter of its own policy, and not by agreement with all or part of the employers of that unit, seek the same wages from other employers." 381 U.S. at 664, 85 S.Ct. at 1590. The union loses the antitrust labor exemption, however, "when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." *Id.* at 665, 85 S.Ct. at 1590. The Court qualified this statement by noting that

> Unilaterally, and without agreement with any employer group to do so, a union may adopt a uniform wage policy and seek vigorously to implement it even though it may suspect that some employers cannot effectively compete if they are required to pay the wage scale demanded by the union. The union need not gear its wage demands to wages which the weakest units in the industry can afford to pay. *Such union conduct is not alone sufficient evidence to maintain a union-employer conspiracy charge under the Sherman Act. There must be additional direct or indirect evidence of the conspiracy.*

*Id.* at 665 n.2, 85 S.Ct. at 1590 n.2 (emphasis added). Thus, the union did not lose its exemption simply by entering into a series of collective bargaining agreements. The agreements alone could not deprive the un-

---

ducing "industrial strife and unrest." 29 U.S.C. § 151.

**15.** Where collective bargaining agreements pertain to subjects which are not mandatory subjects of collective bargaining, some courts have held that the agreements can serve as evidence of a conspiracy. Under § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), mandatory subjects of bargaining are "wages, hours, and other terms and conditions of employment." Thus, Justice White's opinion in *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), found that where a union and an employer agree on mandatory subjects of bargaining an exemption applies, but the exemption is lost when agreement is reached on such topics as prices, which are not proper subjects of collective bargaining. *See American Fed'n of Musicians v. Carroll*, 391 U.S. 99, 108, 88 S.Ct. 1562, 1568, 20 L.Ed.2d 460 (1968); L. Sullivan Handbook of the Law of Antitrust 727–28 (1977).

Here, the collective bargaining agreement concerned itself with wages—explicitly identified as a proper subject of collective bargain-

ing. Thus, the statutory exemption applies. *See Bodine Produce, Inc. v. United Farm Workers Organizing Comm.*, 494 F.2d 541, 551 (9th Cir. 1974) ("Union-imposed restraints which serve purposes closely related to wage, hours, and conditions of employment generally are considered free of *Allen Bradley* taint."). The logic behind this position is clear. " '[C]ollective-bargaining agreements over labor standards inevitably have anticompetitive consequences; to infer from these agreements the necessary elements of a conspiracy to restrain trade under the antitrust laws makes no accommodation for the fact that the national labor policy is based upon the conclusion of these agreements.' " *Smitty Baker Coal Co. v. UMW*, 620 F.2d 416, 423 n.10 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980) (quoting Comment, *Labor-Antitrust: Collective Bargaining and the Competitive Economy*, 20 Stan.L.Rev. 684, 704 (1968)). *See also* Leslie, *Principles of Labor Antitrust*, 66 Va.L.Rev. 1183, 1203 (1980).

ion of the labor antitrust exemption, absent further evidence of a conspiracy.[16] *Accord, California Dump Truck Owners Association v. Associated General Contractors*, 562 F.2d 607, 611 (9th Cir. 1977) ("An antitrust action based upon the [collective bargaining agreement] alone does not state a claim upon which relief can be granted."). The Court, however, found that the plaintiffs had presented proof of an agreement by the union to seek the same wages from all employers, and thus there was an adequate allegation that the statutory exemption had been forfeited. *Id.* at 669.[17] Here, however, all the assertions of conspiracy are based upon the escrow agreement between the defendants. Thus, the statutory labor antitrust exemption applies, and dismissal of the complaint was proper.[18]

The above method of analysis is not uniformly followed, however. Some courts, in-

cluding the court below, have viewed *Pennington* as a distinct model of analysis imposing a strict series of requirements for finding a collective bargaining agreement to form the basis of an antitrust violation. *See Smitty Baker Coal Co. v. UMW*, 620 F.2d 416, 432–33 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *Embry-Riddle Aeronautical University v. Ross Aviation, Inc.*, 504 F.2d 896, 903 (5th Cir. 1974); *Bodine Produce, Inc. v. United Farm Workers Organizing Committee*, 494 F.2d 541, 560–61 (9th Cir. 1974); *Associated Milk Dealers, Inc. v. Milk Drivers Local 753*, 422 F.2d 546, 553–54 (7th Cir. 1970).[19] These requirements were accurately summarized by the district court below:

> Under *Pennington*, the plaintiff must allege five elements: 1) that the union must have agreed to impose upon other

---

**16.** One commentator has distinguished Justice White's opinion in *Pennington* from his opinion in its companion case, *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), on this basis. "In *Pennington* the union had openly conspired with a group of employers," while "[i]n *Jewel Tea*, on the other hand, the collective bargaining agreement itself constituted the labor-nonlabor combination." Comment, *Labor's Antitrust Exemption After Pennington and Jewel Tea*, 66 Colum.L.Rev. 742, 755 (1966).

**17.** The Court also found that the nonstatutory exemption did not apply. *See* text accompanying notes 25–27, *infra*.

There is no allegation in the plaintiffs' complaint that the union adopted a "take it or leave it" stance in negotiations with the plaintiff contractors. Indeed, the National Labor Relations Board found that this was not the case. *See* note 3, *supra*. Thus, all that can be inferred from the escrow agreement is a promise by the employer to be bound by any wage increase, up to $2.25 per hour, that the union could negotiate with other contractors. Such agreements have never been held violative of the antitrust laws.

Furthermore, even if the union had adopted such a position the plaintiffs would have to allege that this position stemmed from a *shared purpose* with a non-labor group, and was not maintained by a union " 'as a matter of its own policy.' " *Ramsey v. UMW*, 401 U.S. 302, 312–13, 91 S.Ct. 658, 664–65, 28 L.Ed.2d 64 (1971) (quoting *UMW v. Pennington*, 381 U.S. 657, 664, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965)).

**18.** Further support for this proposition is provided by the Supreme Court's opinion in *Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). There, the Court found that a union representing workers in the building trades violated the antitrust laws by exacting an agreement from a contractor not to subcontract work to firms lacking a collective bargaining agreement with the union. The Court noted that the union had no interest in representing the contractor's employees. Therefore, it noted that "[t]here can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement." *Id.* at 625–26, 95 S.Ct. at 1836. This suggests that an agreement would not be sufficient to evince a conspiracy where it was only contained in a collective bargaining agreement. *See Smitty Baker Coal Co. v. UMW*, 620 F.2d 416, 424 n.19 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *Larry V. Muko, Inc. v. Southwestern Pa. Bldg. & Constr. Trades Council*, 609 F.2d 1368, 1373 (3d Cir. 1979); *Commerce Tankers v. National Maritime Union*, 553 F.2d 793, 801 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

**19.** Indeed, *Pennington* is sometimes viewed as a case in which the Supreme Court permitted an allegation of conspiracy to be based *solely* on an agreement concerning a subject of mandatory bargaining. *See, e.g.*, St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law*, 62 Va.L.Rev. 603, 621 (1976).

employers terms agreed to by it and a "non-labor" entity; 2) that the union activity must not be unilateral; 3) that the union activity must be at the behest of or 4) in combination with, a non-labor entity which occupies such a position in the competitive structure that it would *directly benefit* from the restraint; and 5) that the union and non-labor groups share an anti-competitive concerted purpose.

*Mid-America Regional Bargaining Association v. Will County Carpenters District Council*, No. 80 C 1832, slip op. at 4 (N.D.Ill. Feb. 11, 1981). *See also Smitty Baker Coal Co. v. UMW*, 620 F.2d 416, 432–33 (4th Cir.), cert. denied, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).

The district court noted, and we agree, that under this analysis the plaintiffs failed to allege that the non-labor entities (Newberg and Edison) would *directly* benefit from the restraint. Tying its analysis to the Supreme Court's decision in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the district court correctly found that the primary effect of the agreement was on wage scales, and thus any benefit to non-labor entities would be indirect. *Mid-America Regional Bargaining Association v. Will County Carpenters District Council, supra* at 5.[20] Since any anti-competitive effect resulted "from the elimination of wage competition," the labor exemption covered the alleged agreement. *Id.* at 5–6.

Although the district court did not find it necessary to look beyond the question of direct impact on the business market, we note that the plaintiffs' complaint also fails to properly plead a *concerted anti-competitive purpose*. This requires a shared purpose between the union and non-labor entities to restrict competition. The complaint here, however, alleges three *different* purposes for the agreement reached among the parties. The union allegedly entered the agreement to weaken the resistance of contractors to its wage demands (¶ 41(d)). Edison allegedly agreed to subsidize the agreement in order to maintain production on its generating stations (¶ 40(d)). Finally, Newberg allegedly entered into the agreement in order to force a ruinous wage increase and thereby gain an unlawful competitive advantage (¶ 41(e)).

These pleadings fail on two levels to demonstrate a concerted anti-competitive purpose. First, it is clear that each party had a separate and distinct purpose—there simply was no single shared purpose.[21] Second, the only *anti-competitive* purpose alleged was possessed by Newberg. Yet the complaint fails to plead even this interest properly, for it alleges that Edison agreed to "pressure" its contractors into signing the escrow agreement with the union (¶ 40). Thus, the complaint alleges that the only party who might reap an anti-competitive benefit from the agreement did not in fact seek that result, but was forced into acting by a non-labor entity lacking anti-competitive intent. This pleading is clearly

---

**20.** This approach tends to result in combining what the Supreme Court in *Connell* noted were two separate analyses. The court below thus seemed to base its decision on a combination of statutory and nonstatutory exemption grounds. While the court looked to specific statutes, its analysis of impact on the labor and business markets is identified in *Connell* as analysis appropriate to determining whether there is a basis for a nonstatutory exemption.

**21.** The complaint alleges that each party *knew* the likely results of its actions and, therefore, intended them. This is not enough, absent an allegation of *purpose*, to plead a cause of action under *Pennington*. As the court in *Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc.*, 504 F.2d 896, 903 (5th Cir. 1974), noted:

A rule of law requiring a lower level of intent than purpose would open the way to disastrous incursions upon Congressionally-sanctified areas of labor union activity. When a union imposes a collective bargaining agreement upon Company X, it will always advantage X by forcing the same agreement on competitor Company Y which theretofore offered less advantageous terms and working conditions. This is a fact of commercial life known to all unions. But if possession of that knowledge should mean that the union had to tread warily in negotiating with Y, refraining from striking, for example, or from taking a rigid bargaining stance for fear of losing the antitrust exemption, labor policy would be stood on its head.

inadequate to fall within the *Pennington* model. *See Cedar Crest Hats, Inc. v. United Hatters, Cap & Millinery Workers,* 362 F.2d 322, 326 (5th Cir. 1966).

The plaintiffs' complaint, therefore, failed to properly allege a conspiracy between the defendants in this case that would remove the complained of acts from the scope of the statutory labor exemption.[22] The district court properly dismissed the complaint.

### B

Even were we to find that the complaint contained adequate allegations of conspiracy to remove this case from the statutory labor exemption, this would not be dispositive. Where a complaint properly alleges a conspiracy between a union and non-labor entities, a nonstatutory antitrust exemption may still apply. This is true of this case.

The foundations of the nonstatutory exemption are not as easily identifiable as those of the statutory exemption. The origins of the exemption, however, are generally traced to Chief Justice Stone's opinion in *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). *See, e.g., Consolidated Express, Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494, 513 (3d Cir. 1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980).[23] In *Apex Hosiery,* the Court found that a violent strike, which inevitably inter-

fered with the flow of the employer's goods in interstate commerce, was not actionable under the Sherman Act. Although the Court examined the statutes underlying the statutory exemption, it did not base its decision upon the statutory exemption. Instead, it held that because the plaintiffs had failed to show that the union's actions had been intended to operate, and had operated, as substantial restraints on *commercial competition,* no claim was stated under the Sherman Act. The Court contrasted restraints on commercial competition with restraints on the market for labor. "It would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or restraints in restraint of trade or commerce under the Sherman Act." *Id.* at 503. While *Apex Hosiery* appeared to rest on the ground that substantive liability under the Sherman Act did not attach to the union activities complained of, later courts and commentators have viewed the case as establishing a nonstatutory exemption from Sherman Act coverage for restraints acting primarily upon the labor market. *See, e.g., Consolidated Express, Inc. v. New York Shipping Association,* 602 F.2d 494, 513 (3d Cir. 1979), *vacated on other grounds,* 448 U.S. 901, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); Leslie, *Principles of Labor Antitrust,* 66 Va.L.Rev. 1183, 1196–97 (1980).[24]

---

**22.** Although both the statutory and the nonstatutory exemptions are generally phrased as exemptions for union behavior, logic dictates that they be applied to all parties when an agreement with a union forms the basis of a complaint. The exemptions would serve little purpose in furthering national labor policy if employers risked liability under the antitrust laws for entering into collective bargaining agreements. Other circuits have concurred in this judgment. "To preserve the integrity of the negotiating process, employers who bargain in good faith must be entitled to claim the antitrust exemption." *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 847 n.14 (3d Cir. 1974). *See also Amalgamated Meat Cutters & Butchers Local 576 v. Wetterau Foods, Inc.,* 597 F.2d 133, 136 (8th Cir. 1979); *Mackey v. NFL,* 543 F.2d 606, 612 (8th Cir. 1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

**23.** Others place the genesis of the nonstatutory exemption much later, with the Supreme Court's decision in *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). *See, e.g., California Dump Truck Owners Ass'n v. Associated Gen. Contractors,* 562 F.2d 607, 611 (9th Cir. 1977).

**24.** There is some question whether *Apex Hosiery* represents a finding of a lack of substantive liability as opposed to a finding that the conduct was exempted. Thus, one author states in one part of an article that "the actual holding" of *Apex Hosiery* "was that a union did not violate the Sherman Act by engaging in a violent primary sit-down strike," and in another that "the nonstatutory exemption apparently originated" in *Apex Hosiery.* St. Antoine, *Connell: Antitrust Law at the Expense of Labor*

This exemption was more explicitly developed by Justice White's opinion in *UMW v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).[25] In *Pennington*, after finding the statutory exemption inapplicable to an alleged conspiracy between mine operators and the union to impose a ruinous wage scale on small mine operators,[26] Justice White's opinion for the Court enunciated what is now known as the "nonstatutory exemption." *See Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). Justice White looked to "national labor policy" as expressed in the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, to determine whether anything in the Act conflicted with his conclusion that the union's agreement was a proper subject of antitrust scrutiny. 381 U.S. at 666, 85 S.Ct. at 1591. He found that national labor policy was, in fact, violated by an agreement which "strait-jacketed" the union into an agreement to seek higher wages than an employer could afford. *Id.* The Court compared this agreement with other illegal agreements where "the restraint on the product market is direct and immediate." *Id.* at 663, 85 S.Ct. at 1589. The effect of this agreement was to limit the union's freedom to act in its self-interest while furthering the employers' goal of elimination of competition. *Id.* at 666–67, 85 S.Ct. at 1591. Such an agreement was contrary to national labor policy and thus not entitled to any exemption from antitrust liability. *See* Leslie, *Principles of Labor Anti-*

*trust*, 66 Va.L.Rev. 1183, 1207 (1980). The Court emphasized that industry-wide collective bargaining, on the other hand, was permissible because "the effect on the product market, though clearly present, results from the elimination of competition based on wages among employers in the bargaining unit, which is not the kind of restraint Congress intended the Sherman Act to proscribe." 381 U.S. at 664, 85 S.Ct. at 1590.

In *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), decided the same day as *Pennington*, the Court held that a union did not violate the antitrust laws by seeking and obtaining a collective bargaining agreement with retail stores which prohibited the sale of meat between six at night and nine in the morning. Justice White's opinion[27] suggested that, although there was no allegation of conspiracy in the case, this did not automatically bestow an antitrust exemption upon the challenged agreement. *Id.* at 688–89, 85 S.Ct. at 1601.

Although this position seems to conflict with earlier statutory exemption cases, it can be reconciled with them when the nature of the agreement is considered. Justice White noted that "[e]mployers and unions are required to bargain about wages, hours and working conditions, and this fact weighs heavily in favor of antitrust exemption for agreements on these subjects." *Id.* at 689, 85 S.Ct. at 1601.[28] An agreement on such subjects, presumably, would receive the statutory exemption. Some agreements on nonmandatory subjects, such as price scales, however, could violate the antitrust

Law, 62 Va.L.Rev. 603, 606, 618 n.64 (1976). While Justice Douglas decried the tendency to confuse the questions of liability and exemption, *Ramsey v. UMW*, 401 U.S. 302, 314, 91 S.Ct. 658, 665, 28 L.Ed.2d 64 (1971) (Douglas, J., dissenting), much of the analysis of *Apex Hosiery* has been adopted in examining the nonstatutory exemption. *See, e.g., UMW v. Pennington*, 381 U.S. 657, 666, 85 S.Ct. 1585, 1591, 14 L.Ed.2d 626 (1965).

25. While Justice White did not write for a majority of the Court in *Pennington* or *Jewel Tea*, the Court has since looked to his opinions as authoritative expositions of the nonstatutory

exemption. *See Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975).

26. *See* text accompanying notes 15–17, *supra*.

27. Justice White's opinion received the votes of only two other Justices. There was no opinion of the Court.

28. 29 U.S.C. § 158(a)(5) imposes a duty upon employers to engage in collective bargaining with employees.

laws. Since the agreement at issue in *Jewel Tea* fit neither category directly, it became necessary to examine whether an exemption based on policy rather than statutory language would apply:

> [T]he issue in this case is whether the marketing hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, *falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.*

*Id.* at 689–90, 85 S.Ct. at 1601–02 (emphasis added) (footnote omitted). In a footnote, the opinion made it clear that the "crucial determinant" was whether the agreement had a direct impact on labor interests or "the labor market." *Id.* at 690 n.5, 85 S.Ct. at 1602 n.5. Thus, *Jewel Tea*, in conjunction with *Pennington*, suggests the existence of a labor exemption to the antitrust laws whose boundaries were determined by attempting an accommodation between national labor policy and antitrust laws, which was reached in turn by an examination of the impact of a given agreement on the labor and product markets.[29]

This interpretation was confirmed by the Supreme Court in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). There, a general contractor sought to invalidate an agreement between the contractor and the union whereby the contractor agreed to deal with mechanical subcontractors only if they were parties to the union's multiemployer collective bargaining agreement. The Court began its analysis by noting that the statutory exemption does not exempt "concerted action or agreements between unions and nonlabor parties." *Id.* at 622, 95 S.Ct. at 1835. Nevertheless, the Court noted that "a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in the business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." *Id.*

The Court hinged its determination on whether the agreement between the union and the employer was a "direct restraint on the business market," as opposed to an indirect restraint that would "follow naturally from the elimination of competition over wages and working conditions." *Id.* at 625, 95 S.Ct. at 1836. Because the union in *Connell* imposed "direct restraints on the business market" by limiting which subcontractors could receive the business of the contractor, the Court found that no exemption applied. *Id.* at 623, 95 S.Ct. at 1835. *Connell* is thus consistent with the *Apex Hosiery* mode of analysis—finding a nonstatutory exemption for restraints on the labor market which might indirectly affect the business market, but denying the exemption for direct restraints on the business market.[30]

This is the interpretation of the nonstatutory exemption adopted by the court in *Consolidated Express, Inc. v. New York Shipping Association*, 602 F.2d 494 (3d Cir. 1979), *vacated on other grounds*, 448 U.S. 901, 100 S.Ct. 1596, 14 L.Ed.2d 113 (1980).

---

**29.** A more general statement is that "the availability of the nonstatutory exemption for a particular agreement turns upon whether the relevant federal labor policy is deserving of preeminence over federal antitrust policy under the circumstances of the particular case." *Mackey v. NFL*, 543 F.2d 606, 613 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (citations omitted). The *Connell* labor-business market distinction appears to serve as a generally applicable standard for making this determination. *Id.* at 614.

Where an agreement primarily affects the labor market, the policy favoring collective bargaining is preeminent, but when an agreement has a direct impact on the business market, the antitrust laws are of greater concern.

**30.** The *Connell* opinion's use of the term "business market" instead of "product market" was not, apparently, indicative of a change in the Court's approach. 421 U.S. at 622, 95 S.Ct. at 1835.

There the court explained that "[t]he term nonstatutory exemption, commonly used in discussing the interface between the often conflicting national antitrust and labor policies, is a shorthand description of an interpretation of the Sherman Act, making that statute inapplicable to restraints imposed in the interest of lawful union monopoly power in the labor market." *Id.* at 513. Thus, "the rationale of the exemption is protection of the union's power to eliminate competition in the labor market over wages and working conditions. Restraints operating on the primary market are presumptively outside the scope of the Sherman Act." *Id.* at 514. The *Consolidated Express* court recognized, therefore, that the central examination in *Connell* was whether there was a direct restraint on business. *Id.* at 517. *See also Commerce Tankers Corp. v. National Maritime Union*, 553 F.2d 793, 801 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

 Thus, a complaint must allege conduct operating as a direct restraint upon the business market in order to avoid application of the nonstatutory exemption. Restraints operating primarily upon the business market will fall within the scope of the exemption, regardless of any indirect effects that they may be alleged to have upon commercial competition. An examination of the plaintiffs' complaint in light of the nonstatutory exemption demonstrates that the district court properly dismissed the plaintiffs' complaint. The complaint alleges no more than an agreement to restrain the labor market. As such, it is exempt from antitrust scrutiny.

It is difficult to imagine a case in which the alleged agreement concerned wages more directly than the complaint here.[31] The crux of the complaint is an allegation

that Newberg agreed to pay as much as a $2.25 per hour wage increase, depending on what other contractors did. The plaintiffs allege that the union knew that the effect of this agreement would be to cause other employers to offer a retroactive wage increase equal to the maximum contemplated by the union's agreement with Newberg. The restraint thus alleged is not a "direct restraint on the business market" but rather a direct restraint on the labor market, with only tangential effects on the business market. Any possible harm to the plaintiffs would "follow naturally from the elimination of competition over wages and working conditions." *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 625, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975). Thus, the nonstatutory exemption would apply in this case.

III

We conclude that the district court correctly dismissed the plaintiffs' complaint. Both the statutory and nonstatutory labor exemptions served to immunize the defendants' activities from antitrust liability. The order of the district court is

AFFIRMED.

---

**31.** The Supreme Court has taken a broad view of what constitutes an agreement with a direct impact on the labor market. Thus, in *Local 24, Int'l Bhd. of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), the Supreme Court examined a state antitrust challenge to a collective bargaining agreement. The agreement provided for a minimum wage scale for truck drivers and, to prevent evasion, included a provision that drivers who owned and operated their own vehicles would be paid a prescribed rental for their vehicles in addition to the required wage. The Supreme Court found that the state antitrust laws could not be applied. The Court found that the agreement was one directly affecting wages, and not " 'a remote and indirect approach to the subject of wages.' " *Id.* at 293, 79 S.Ct. at 303.