**EHREDT UNDERGROUND, INC., Plaintiff,**

v.

**COMMONWEALTH EDISON COMPANY and International Brotherhood of Electrical Workers, Local No. 196, Defendants.**

No. 91 C 2361.

United States District Court, N.D. Illinois, E.D.

July 16, 1993.

Gerard C. Smetana, Eugene G. Bruno, Richman, Lawrence, Mann, Greene & Smetana, Chicago, IL, for plaintiff.

Gerald Allen Ambrose, James Stanton Whitehead, Brian Jeffrey Gold, Sidley & Austin, Robert Emmett Fitzgerald, Jr., Robert E. Fitzgerald, Jr., Ltd., Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This matter is before the Court on the parties' objections to Magistrate Judge W. Thomas Rosemond's Report and Recommendation ("Report") on Defendant Local 196's Motion to Dismiss Counts II and III of Plaintiff's First Amended Complaint. Plaintiff Ehredt Underground, Inc. ("Ehredt") filed a four-count complaint against Commonwealth Edison Company ("Com Ed") and International Brotherhood Of Electrical Workers, AFL–CIO, Local No. 196 ("Local 196"). Count II is directed at both defendants and alleges that they engaged in unlawful combinations and conspiracies in restraint of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Count III is directed solely at Local 196 and is a state law claim of tortious interference with the right of contract and prospective advantage. Magistrate Judge Rosemond recommended denying the defendant's motion to dismiss Count II and granting defendant's motion to dismiss Count III. For the reasons stated below the Court accepts the recommendations of the Magistrate Judge and accordingly denies defendant's motion to dismiss Count II and grants defendant's motion to dismiss Count III.

### I. FACTS[1]

Plaintiff Ehredt is a corporation engaged in the business of underground excavation and installation of electrical cables. Ken Ehredt is its President.

Defendant Local 196 is a labor organization affiliated with the International Brotherhood of Electrical Workers, AFL–CIO ("the International"). Harold Eastwood and Dave Lindsey are business managers for Local 196.

Commonwealth Edison Co. ("Com Ed") and Illinois Bell Telephone Company ("Illinois Bell") divide responsibility for installation of electrical and telephone cable. Contractors laying cable for Com Ed also act as agents for Illinois Bell and lay telephone cables at the same site and at the same time. Geographic areas are divided and either Com Ed or Illinois Bell accepts sole responsibility for installation.

In 1988, a construction foreman for Com Ed invited Ehredt to submit a bid for a contract to install cables. Ken Ehredt was told that his company must be a union contractor if he wanted to submit a contract proposal and do business with Com Ed. Ehredt received a packet of materials from Com Ed describing the bid proposal procedure and outlining the specifications of the project. Com Ed's bid proposal form requires bidding

1. As the parties do not object to the factual allegations as set out in the Report, the Court restates them here as they appeared in the Report.

parties to identify the union with which the bidding party has a labor contract.

Ehredt began discussions with several unions and finally entered into a collective bargaining agreement with International Brotherhood of Electrical Workers, AFL–CIO, Local 336 ("Local 336"). Local 336 is a labor organization affiliated with the International and represents many employees working for Illinois Bell and various cable television companies doing trenching and excavation work. An agreement between Ehredt and Local 336 was approved by the International.

On October 14, 1988, Ehredt submitted a bid to Com Ed on an excavation project. Shortly thereafter, on October 17, Ken Ehredt had a conversation with the president of Com Ed's Northbrook-area, in-house union. The union president told Ehredt that Com Ed had an agreement with its union to subcontract only with union subcontractors. Ehredt was awarded a contract with the agreement that Ehredt was to perform the work as a union contractor.

Beginning in November 1988, various representatives of Com Ed advised Ehredt that it should provide kickbacks for the award of work. Each and every time, plaintiff refused to do so. A Com Ed representative also told plaintiff that Trench-it had provided kickbacks to Com Ed supervisors. Trench-it is a union contractor in the excavation and cable installation industry and has a collective bargaining agreement with Local 196.

Sometime after Ehredt began working for Com Ed, Local 196 and the International began a campaign to pressure Ehredt to abandon Local 336 and sign a collective bargaining agreement with Local 196. Starting in late 1988, Ehredt's workers began noticing that they were being followed from job site to job site.

In April 1989, the union campaign escalated to physical violence when Ehredt's manager, Terry Counley, and one other worker were excavating at a remote, Com Ed job site. While the other employee was away getting equipment, two individuals approached Counley. Plaintiff believes they traced the crews' activities through routing information improperly furnished by Com Ed. They asked to see Counley's union card, which he produced for them. After inspecting the card, the two men picked up some of Counley's equipment and dropped it in the trench. When Counley bent over to pick up the equipment, the two men began to beat Counley. They told Counley that is what he could expect if he ever worked at that site again. After leaving Counley lying in the trench, the two men released the brake on Ehredt's earth-moving equipment and departed.

Moments later Local 196's business agent, Dave Lindsey, arrived at the job site and questioned Counley about whether Ehredt's employees would switch from Local 336 to Local 196. Counley told Lindsey that he could not give him an answer and asked for Lindsey's card. Lindsey then handed him Harold Eastwood's business card. As noted above, Harold Eastwood was a business manager for Local 196.

On another occasion, Eastwood told Ken Ehredt and Counley that Ehredt's workers were in the wrong union and that they should switch to Local 196 because the work they were performing was within Local 196's jurisdiction. He said Local 196 was determined to get all the work it felt was within its jurisdiction. Eastwood told Ehredt that Local 196 had only one more contractor (Illinois Hydraulic) to get and then the union could claim all of Com Ed's excavation and cable installation contractors as members. Eastwood also told Ehredt that there was a Com Ed Board member who assisted him in either getting rid of non-union excavation and cable installation contractors or in getting them into Local 196.

Throughout the contract period with Ehredt, Com Ed expressed its satisfaction with Ehredt's work. In fact, between October 1988 and March 1990, plaintiff's contract was extended three times by Com Ed. During this same period, Com Ed entered into an agreement with Trench-it to perform identical work in the same geographic area. The work was allocated by Com Ed between the contractors on a work order basis.

Meanwhile, Doug Hill, a supervisor in the underground construction department of Com Ed's Crystal Lake District, repeatedly

threatened to terminate Ehredt and replace it with Trench-it. Hill and other Com Ed supervisors also repeatedly gave away plaintiff's contracted work to Trench-it. In addition, Hill often falsely blamed Ehredt for falling behind in its work and threatened to give the work to Trench-it.

On one occasion, plaintiff was blamed for misconduct attributable to Trench-it. When Hill discovered that a contractor had left open a television cable trench, Hill blamed Ehredt and threatened to terminate Ehredt's contract. Later, however, when Hill discovered that Trench-it was responsible, he took no action.

Ehredt believes that a Com Ed foreman, who assigned work, had a financial investment in excavating equipment used by Trench-it and assigned favored work to Trench-it to protect his investment. Also, Com Ed made equipment and facilities available to Trench-it at very favorable terms which were not available to plaintiff.

In January 1990, Com Ed began to solicit bids for a second contract. In connection with this bid, Hill told Ehredt that once Trench-it won the contract, most of Ehredt's employees would probably quit to work for Trench-it. Since the contract had not yet been awarded, Ehredt understood this to mean that Trench-it would receive special consideration in the bidding process.

Ken Ehredt took his concern to Forrest Stahmer, Com Ed's Contract Coordinator. Stahmer assured Ehredt that the bidding procedure was kept as apolitical as possible and invited Ehredt to submit a bid on the contract. Prior to the award, another Com Ed representative contacted Ken Ehredt to request that he lower some of his contract prices. Since this was necessary to win the contract, Ehredt agreed to do so.

On March 23, 1990, Ehredt was awarded a second contract to perform work in the same territory—the Crystal Lake District—for a two-year period running from April 1, 1990 to March 31, 1992 with the understanding that the work would be performed as a union contractor. Approximately three days after the contract was awarded, Hill called Ehredt's manager, Terry Counley, into his of-

fice. Hill told Counley that he did not think Ehredt Underground could handle the work they had contracted to do and that he would keep an eye on them. Hill threatened that, if Ehredt did not meet his standards, he would pull them off the job and give the work to Trench-it.

Trench-it had bid unsuccessfully for the Crystal Lake District work. Plaintiff believes Trench-it was unhappy to have lost this work and attributed the loss to lesser wages paid by plaintiff. Ehredt further believes that Trench-it communicated its concerns to Local 196 and to Com Ed. Subsequently, agents of Local 196 and laid-off employees of Trench-it communicated threats of property damage and other harm to plaintiff through various Com Ed supervisors.

In conjunction with Local 196's campaign to recruit Ehredt, Local 336 began a parallel campaign to oust Ehredt, presumably under pressure from the International. By letter dated July 17, 1990, Local 336's president and business manager, Albert Franzen, advised Ehredt that the work being performed by Ehredt's workers pursuant to the Com Ed contract was out of Local 336's jurisdiction, even though similar work was performed by employees of Illinois Bell who were represented by Local 336. Franzen recommended that Ehredt cease doing such work. Ehredt refused to breach its contract with Com Ed and Local 336 terminated its collective bargaining agreement with Ehredt on August 21, 1990.

Ehredt then began discussions with other unions to replace Local 336. Ehredt considered the Congress of Independent Unions ("CIU"). The CIU is a labor organization which is not affiliated with the AFL–CIO. The wage scale which would have been implemented under a collective bargaining agreement with the CIU was roughly comparable to the wages plaintiff paid under the Local 336 contract.

Ehredt informed James Harper, purchasing agent for Com Ed, that his company was being put out of Local 336. When Ehredt offered to work as a non-union contractor, Harper refused. Consequently, plaintiff told Harper he was going to negotiate a contract with the CIU. At first, Harper accepted the

idea, however, he said he would have to clear it though the legal department. About three weeks later, Harper replied that Com Ed refused to do business with any contractor whose employees were represented by a union that was not an AFL–CIO affiliate.

As a result of the conduct of Local 336 and the restrictions placed on Ehredt by its contract with Com Ed (to-wit, that the company must be an AFL–CIO affiliated union contractor), Ehredt was forced to seek another AFL–CIO union to represent its employees if it wanted to keep its contract with Com Ed. Consequently, Ehredt began discussions with several AFL–CIO affiliated unions, including Local 196, International Union of Operating Engineers Local 150, and IBEW Local 117. At one point Com Ed representative Hill told Ehredt, "We don't want 150. Why don't you go with 196 and make everybody happy?"

On September 26, 1990, the president of CIU filed a petition to represent Ehredt workers for purposes of collective bargaining. Consequently, the National Labor Relations Board ("NLRB") scheduled an election for Ehredt's employees on November 19, 1990. Approximately one week prior to the election, Local 196 redoubled its efforts to pressure Ehredt and its employees to join Local 196. Specifically, agents of Local 196 now attempted to get the local on the election ballot. Agents from the International contacted Ehredt's employees at their homes in an effort to rally enough employee support.

Having tried previously but failing to solicit support from Ehredt's employees, agents of Local 196 contacted Ken Ehredt and arranged a meeting with him on November 10, 1990. At that meeting, Ehredt was told that if Local 196 was given a collective bargaining agreement with Ehredt, the Local would assist in obtaining Com Ed's consent to the contract price changes which would be necessary given Local 196's significantly higher wage structure. Ehredt was also promised that the union would allow him to continue running the company with his current employees as he had under Local 336. On the basis of these oral agreements, he agreed that he would not oppose Local 196's appearance on the NLRB election ballot and he so notified his employees.

On November 19, 1990, the employees of Ehredt elected Local 196 as their exclusive collective bargaining representative and the union later was certified as such by the NLRB. Ehredt signed a collective bargaining agreement with Local 196 on December 17, 1990. Ehredt had previously been shown the agreement during the November 10 meeting. Ehredt claims there was and could be no negotiation over terms. The agreement became effective January 1, 1991 and provided for a wage scale that was nearly ninety percent (90%) higher than wages under the agreement with Local 336.

As a result of the termination of the collective bargaining agreement with Local 336 and the new agreement with Local 196, plaintiff determined that an equitable adjustment in its contract with Com Ed was necessary. Plaintiff was led to believe by Com Ed and Local 196 that a contract adjustment would be made. Ehredt sent Com Ed a letter on November 9, 1990 to notify them that it needed to revise its contract rates because the original bid for the project was based on Local 336's lower wage structure.

Ken Ehredt requested a meeting to discuss the renegotiation of the contract. He was asked to send a new proposal in preparation for that meeting. On November 28, 1990, Ehredt and his accountant met with Com Ed's representatives. At the meeting, they were told that the revised proposal was generally acceptable except for approximately eight items. Ehredt offered to cut the revised bid for those items by fifty percent (50%).

On December 13, 1990 (after Local 196 was certified as the collective bargaining union, but four days before an agreement was signed between Ehredt and Local 196), Com Ed advised Ehredt that his revised bid was rejected. Ehredt was further told that unless he could stick to his original bid, he would lose the contract to Trench-it. On January 14, Com Ed terminated plaintiff's contract and awarded it to Trench-it. Trench-it hired eighty percent (80%) of plaintiff's employees—many of whom were ultimately replaced by children of Com Ed employees.

Plaintiff filed its original Complaint against Com Ed and Local 196 on April 19, 1991. Plaintiff subsequently filed an Amended Complaint ("the Complaint") on December 20, 1991. Plaintiff alleges that Local 196 and Com Ed (a non-labor party) engaged in a conspiracy to eliminate open-shop contracting. Plaintiff claims Local 196, Com Ed, Trench-it, the International, and Local 336 all conspired to eliminate open-shop contractors from performing trenching services in the relevant marketplace in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Plaintiff also asserts that Local 196's actions amount to tortious interference with contract and prospective advantage.

Defendant Local 196 moved to dismiss Counts II and III of Plaintiff's Amended Complaint. Local 196 contends it is entitled to the labor exemption to the antitrust laws and therefore Count II of the Complaint should be dismissed. Defendant also argues that Count III of the Complaint should be dismissed because this state law claim of tortious interference with the right of contract is preempted by federal labor law.

Magistrate Judge Rosemond recommended that defendant's motion to dismiss Count II be denied and the motion to dismiss Count III be granted. Defendant objects to the Magistrate Judge's recommendation to deny its motion to dismiss Count II, while Plaintiff objects to the Magistrate Judge's recommendation to dismiss Count III.

## II. *DISCUSSION*

■ A district court reviewing the Report and Recommendation of a Magistrate Judge makes a *de novo* determination of the record "of any portion of the magistrate's disposition to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate with instructions." FED.R.CIV.P. 72(b); 28 U.S.C. § 636(b)(1). Therefore, the court will review the objections of both parties and shall only dismiss a count for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it]

to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court accepts all well pleaded facts in the complaint as true and views allegations in a light most favorable to the plaintiff. *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir.1987).

## A. *Count II—Antitrust Claims*

■ Defendant makes four objections to the Magistrate Judge's recommendation that defendant's motion to dismiss Count II be denied. First, the Defendant objects to the factual finding that agents of Local 196 engaged in physical violence or threats of physical violence against employees of plaintiff. Specifically, defendant argues the Complaint alleges only that two unknown men beat plaintiff's employee and that "even the most generous reading of the Amended Complaint does not allege that the two unnamed persons were Agents of Local 196." (Defendant's Objections to the Magistrate Judge's Report, at p. 2). The court disagrees.

When deciding a motion to dismiss, the court should "take the allegations in the complaint to be true and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiffs." *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985). It is reasonable to conclude from the Complaint that the men who came to Ehredt's job site in April of 1989 and destroyed equipment and beat one of Ehredt's employees were acting as agents of Local 196.

Several allegations in the Complaint make this a reasonable inference. First, plaintiff alleges that two unknown men showed up at an Ehredt job site in April 1989. (Plaintiff's First Amended Complaint, at p. 14, ¶ 39). These men allegedly had traced Ehredt to this remote job site (this site was not visible to general traffic and was not a matter of public knowledge) through information improperly provided by Commonwealth Edison. *Id.* Once they arrived at the job site, they beat Terry Counley, an employee of Ehredt, and destroyed much of the equipment at the job site. *Id.* They told Counley that these attacks would continue if Ehredt worked in Cary, Illinois again. *Id.* Just moments after

these men left, Dave Lindsey, the business agent for Local 196, arrived at the Ehredt job site to convince Counley and his employer Ehredt to switch from Local 336 to Local 196. *Id.*

The short period of time that passed between Lindsey's arrival at the job site and the attack by the two unnamed men, combined with the ability of both Lindsey and the two unknown men to find plaintiff's worksite location, information that was not a matter of general knowledge and which allegedly was provided improperly by Com Ed, leads the court to the reasonable inference that the two unknown men were agents of defendant Local 196. Accordingly, the defendant's objection is overruled.

Defendant's second, third and fourth objections are made to the Magistrate Judge's legal conclusion that the defendants are not entitled to an exemption from the antitrust laws. Specifically, defendant Local 196 objects to the "legal conclusion that a conspiracy was properly pled, ... that the statutory exemption to Anti–Trust Law does not apply ... [and] [t]he legal conclusion that the nonstatutory exemption [does] not apply." (Defendant's Objections to the Magistrate Judge's Report, at p. 1). The Court disagrees for the reasons that follow.

### 1. *History of the Labor Exemption*

■ The labor exemption to the antitrust laws reflects the accommodation between the congressional policies favoring free competition in the marketplace as reflected by federal antitrust laws, and the labor policies favoring collective bargaining and other union activities reflected by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* "[T]here is an inherent tension between national antitrust policy, which seeks to maximize competition, and national labor policy, which encourages cooperation among workers to improve the conditions of employment." *H.A. Artists & Associates, Inc. v. Actors' Equity Ass'n,* 451 U.S. 704, 713, 101 S.Ct. 2102, 2108, 68 L.Ed.2d 558 (1981). The obvious tension between these two policies became apparent shortly after the passage of the first antitrust law in 1890.

Section 1 of the Sherman Act states "[e]very contract, combination ... or conspiracy in restraint of trade ... is illegal." 15 U.S.C. § 1 (1992). Immediately after its passage a sharp controversy arose as to whether this act applied to labor union activities, especially collective bargaining agreements. *Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers,* 325 U.S. 797, 801, 65 S.Ct. 1533, 1536, 89 L.Ed. 1939 (1945). Soon after the Sherman Act was passed, courts adopted the view that "a combination of laborers to obtain a raise in wages was itself a prohibited monopoly," and began to hold labor unions liable for violations of the antitrust laws. *Id.* at 802, 65 S.Ct. at 1536. Congress responded by passing sections 6 and 20 of the Clayton Act. With the passage of these provisions, "Congress sought to specifically exempt labor union activity" from antitrust liability. *Mid–America Regional Bargaining Ass'n v. Will County Carpenters Dist. Council,* 675 F.2d 881, 884 (7th Cir.1982). Section 6 states that "the labor of a human being is not a commodity or article of commerce ... nor shall such [labor] organizations, or the members thereof, be held ... to be illegal combinations or conspiracies in restraint of trade." 15 U.S.C. § 17 (1988). Section 20 limited the power of federal courts to issue injunctions in cases arising out of a labor "dispute concerning terms or conditions of employment." 29 U.S.C. § 52 (1988).

Sections 6 and 20 of the Clayton Act, however, failed to promote the national labor policies due to courts' continued application of the Sherman Act to union activities. Specifically, the courts defined a labor dispute very narrowly and limited the application of the Clayton Act to union activities directed at an employer by its own employees. *See Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n,* 274 U.S. 37, 47 S.Ct, 522, 71 L.Ed. 916 (1927); *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

Congress then enacted the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* to expand the protection for labor unions from antitrust liability. The act prohibits injunctions against employees engaged in various

activities during a labor dispute, even where a claim is made of an unlawful combination or conspiracy. "The Clayton and Norris–LaGuardia Acts combined to provide a comprehensive exemption from antitrust liability for union activity." *Mid–America*, 675 F.2d at 884. Even though the language of the Act does not explicitly exempt union activity from antitrust liability "it has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes." *Id.*

Labor unions, however, do not have absolute immunity from liability under the antitrust laws; they remain accountable for certain anticompetitive activities. Two distinct exemptions to the antitrust laws exist. *Mid–America*, 675 F.2d at 884. The first is a statutory exemption based on various sections of the Clayton and Norris–LaGuardia Acts, and the second is a nonstatutory exemption based on an "accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets." *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975).

We turn, therefore, to an examination of each of these exemptions to demonstrate that neither applies to activity allegedly engaged in by defendant Local 196.

### (a) *The Statutory Labor Exemption*

The defendant objects to the Magistrate Judge's conclusion that the defendant, Local 196, is not entitled to the statutory exemption to the antitrust law. Because the Court finds that the Complaint adequately pleads conduct outside the statutory exemption we overrule the objections and adopt the findings of the Magistrate Judge.

The Supreme Court, in *United States v. Hutcheson*, held that whether a labor union has violated the antitrust laws can be determined only by reading the Sherman Act, the Clayton Act and the Norris–LaGuardia Act together, "as a harmonizing text of outlawry of labor conduct." 312 U.S. 219, 231, 61 S.Ct. 463, 466, 85 L.Ed. 788

(1941). Pursuant to this reading the court announced a broad rule for what has come to be known as the statutory exemption to the antitrust laws:

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.* at 232, 61 S.Ct. at 466. So long as a union acts unilaterally and in its own interest, therefore, it will not be liable for resulting restraints on trade. *Connell,* 421 U.S. at 623, 95 S.Ct. at 1835. However, once a union conspires with employers to restrain trade, that union forfeits its statutory exemption because the purpose of the exemption is not to "immunize labor unions who aid and abet [businessmen] in violating the Sherman Act." *Allen Bradley,* 325 U.S. at 810–11, 65 S.Ct. at 1540. Furthermore, a plaintiff's complaint alleges conduct outside this exemption where the complaint shows the union did not act in its own self-interest or when "a conspiracy between the union and a non-labor entity was properly pled." *Mid–America,* 675 F.2d at 886.

Defendant Local 196 here contends that the Complaint is inadequate on two grounds. First, defendant argues that the Complaint fails to properly plead a conspiracy, and objects to the Magistrate Judge's finding that a conspiracy did exist. As to this objection, the court believes that plaintiff has alleged sufficient facts to show a conspiracy, and accordingly sustains the conclusions of the Magistrate Judge.

First, all the parties to this alleged conspiracy had a motive to force plaintiff out of the market. Trench-it was a competitor of the plaintiff, and had been losing Com Ed bids to Ehredt. (Plaintiff's First Amended Complaint, at p. 12, ¶ 33.) If the campaign to eliminate Ehredt from the marketplace was successful, Trench-it would receive more jobs.

Com Ed also had a financial interest in putting Ehredt out of business. When

Trench-it received bids from Com Ed, it allegedly gave kickbacks to Com Ed employees. *Id.* at ¶ 34. Ehredt had refused to pay these kickbacks. Additionally, a Com Ed foreman had a financial investment in excavation equipment used by Trench-it. *Id.* at p. 10, ¶ 27. Ehredt's elimination from the marketplace served to protect his investment.

Similarly, Local 196 wanted to corner the market on Com Ed business in the far north region. They could only do so by forcing Ehredt to adopt a collective bargaining agreement with 196 or force them out of business.

Furthermore, several facts show that the parties acted on their motivations and formed a conspiracy to eliminate Ehredt from the market place. When Ehredt first began to receive Com Ed jobs, Trench-it expressed concern to Local 196 and to Com Ed. It complained that Ehredt was able to bid lower because it paid their employees lower wages. Shortly after Trench-it spoke to Local 196, the union began to pressure Ehredt to abandon Local 336 and sign a collective bargaining agreement with Local 196.

During the campaign to force plaintiff to sign with Local 196, agents of the defendant union were able to follow plaintiff's employees from jobsite to jobsite. These men were apparently able to follow plaintiff only with the help of Com Ed. The location of these jobsites was available through a routing sheet prepared by Com Ed, which Com Ed allegedly improperly disclosed to the Union. *Id.* at p. 14, ¶ 39.

Plaintiff was also told by the business representative of Local 196 that "there was a Board member of Com Ed who assisted him in getting rid of non-union excavation and cable installation contractors or get them into Local 196." *Id.* at p. 15, ¶ 40. Laid-off employees of Trench-it and agents of Local 196 also allegedly communicated threats of property damage and other harm to the plaintiff through Com Ed supervisors.

Finally, plaintiff agreed to not oppose Local 196 as the collective bargaining agent of its employees. Plaintiff placed Local 196 on the ballot during elections. In exchange, Local 196 agreed to help Ehredt renegotiate its contract with Com Ed to compensate for the significantly higher wage scale Local 196 would impose. Com Ed also led plaintiff to believe renegotiation was possible. However, once Local 196 was certified as the collective bargaining agent of Ehredt's employees, Com Ed refused to make any changes to the original contract price. The court believes these allegations suffice to show that plaintiff can prove a claim which would entitle it to relief based on a conspiracy between Local 196, Trench-it and Com Ed.

Defendant also contends that it is entitled to the statutory exemption because the conduct in which it engaged was part of an organizing campaign and collective bargaining agreement. Defendant argues that no conspiracy exists because it was simply imposing its areawide wage scale. The court disagrees. While a union is free to unilaterally impose the same wage scale on every employer with whom it bargains, and it need not be concerned that the wages it is imposing will be too high for certain employers to pay, "the union loses the antitrust labor exemption ... when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." *Mid–America,* 675 F.2d at 887. However, when such a collective bargaining agreement is part of a conspiracy in restraint of trade, the plaintiff must show that the union conspired with a non-labor entity to impose the wage scale on the plaintiff; that the non-labor entity is in a position to directly benefit from the resulting restraint on trade; and that the union and non-labor groups share an anti-competitive purpose. *Id.* at 889.

Plaintiff's Amended Complaint has met these requirements. As was stated above, the Complaint contains sufficient factual allegations that Local 196, Trench-it and Com Ed conspired to force the plaintiff into a collective bargaining agreement with Local 196 at Local 196's standard wage scale. This coercion was designed to lock plaintiff into a wage scale significantly higher than the wages plaintiff was paying at the time, and ultimately causing Ehredt to breach its con-

tract with Com Ed due to an unplanned increase in employee wages. Local 196 benefited because they were able to take over all the Com Ed trenching and excavation business on the north side. Trench-it and employees of Com Ed both were in a position to benefit financially from Ehredt's elimination from the market place, as stated above. Finally, all three parties shared the anticompetitive purpose of eliminating Ehredt from the market place.

#### (b) *The Non–Statutory Exemption*

■ The court also agrees with the Magistrate Judge's finding that Local 196's actions do not fall within the non-statutory exemption. In order to "accommodate the congressional policy favoring free competition in business markets with the congressional policy favoring collective bargaining under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, certain union-employer agreements [are] accorded a limited nonstatutory exemption from antitrust sanctions." *Mackey v. National Football League*, 543 F.2d 606, 611–12 (8th Cir.1976). The nonstatutory exemption is designed to allow unions and employers freedom in the collective bargaining process. The exemption applies to those terms or conditions of a collective bargaining agreement which are intended to eliminate competition over wages or working conditions, and only indirectly restrain trade in the business market. *Connell*, 421 U.S. at 623, 95 S.Ct. at 1835; *Mid–America*, 675 F.2d at 892. Those agreements that are intended to restrain competition in the business market are not exempt. *Mid–America*, 675 F.2d at 892.

■ The non-statutory exemption was not intended to protect the type of conspiracy allegedly entered into by Local 196, Trench-it, and Com Ed. This exemption was designed to protect the parties to a collective bargaining agreement from antitrust liability when they bargain for terms or conditions which indirectly restrain trade. In the case at bar the parties to the collective bargaining agreement are not the same parties to the conspiracy. Rather, Local 196, Trench-it and Com Ed have allegedly acted in concert to force a collective bargaining agreement upon Ehredt so that it could not compete with

Trench-it. Far from trying to impose a better wage scale, Local 196 has sought to directly restrain the business market by eliminating a participant. Therefore, they are not entitled to the non-statutory exemption.

Thus, plaintiff has properly pled the elements of an antitrust action. Based on the allegations in the Complaint, defendant is not entitled to either the statutory or non-statutory exemption to the antitrust laws. We therefore sustain the finding of the Magistrate Judge that Count II of Plaintiff's First Amended Complaint states a claim upon which relief can be granted. Defendant's motion to dismiss Count II is denied.

### B. *Count III—Preemption of State Claims*

Count III of plaintiff's First Amended Complaint alleges that defendant Local 196, together with Local 336, the International and Trench-it, tortiously interfered with plaintiff's right of contract and prospective advantage. This claim is based upon state tort law. In his Report the Magistrate Judge concluded that this state law claim was preempted by federal labor law and recommended that the claim be dismissed. The court agrees with this conclusion.

■ When a state law or remedy interferes with federal labor policy or specific provisions of the NLRA, any state claims brought pursuant to that state law are preempted. The leading case on federal preemption of state claims involving labor-management disputes is *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon* the court defined the situations when a state claim is preempted:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, ... [or] [w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board. . . .

359 U.S. at 245, 79 S.Ct. at 780. The first question must therefore be whether the actions complained of are subject to Board regulation. *United Ass'n of Journeyman & Apprentices v. Borden,* 373 U.S. 690, 694, 83 S.Ct. 1423, 1426, 10 L.Ed.2d 638 (1963). If they are, then the state claim is preempted by federal labor law. Thus, we turn first to whether plaintiff's allegations are directed at conduct that is arguably prohibited by § 8 of the NLRA.

▆▆▆ In deciding whether the basis of a state law claim is arguably prohibited by the NLRA "[t]he critical inquiry ... is ... whether the controversy presented to the state court is identical to ... or different from ... that which could have been, but was not, presented to the Labor Board." *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 197, 98 S.Ct. 1745, 1757, 56 L.Ed.2d 209 (1978). We think the allegations presented to this court in plaintiff's state tort claim are the same as an unfair labor practice claim brought pursuant § 8(b)(4)(C) of the NLRA, 29 U.S.C. § 158(b)(4)(C). That section states that it is an unfair labor practice to:

> threaten, coerce, or restrain any person ... where ... an object thereof is—
>
> (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section .159 of this title;

In comparison, a claim for tortious interference with contract and prospective economic advantage must establish:

> a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. The interest protected is the reasonable expectation of economic advantage.

*Rock Falls v. Chicago Title & Trust Co.,* 300 N.E.2d 331, 333, 13 Ill.App.3d 359, 363 (3d Dist.1973); *see also Heying v. Simonaitis,* 81 Ill.Dec. 335, 339–40, 466 N.E.2d 1137, 1141–42, 126 Ill.App.3d 157, 162 (1st Dist.1984).

Plaintiff, thus, must prove the same set of facts to recover under the federal and state claims. Recovery under plaintiff's state claim is premised upon a finding by this court that Local 196 intentionally interfered with plaintiff's contract with Com Ed and that such interference caused plaintiff to breach its contract. In this regard, plaintiff points to several factors to show interference. Plaintiff alleges defendant Local 196 engaged in a "heavy-handed effort to convince the International president to force IBEW Local 336 to cancel Ehredt's contract with knowledge that Edison required Ehredt to be a union contractor and knowing that IBEW Local 196 was the only acceptable alternative union." (Plaintiff's Objection to the Magistrate Judge's Report, at p. 6). The essence of plaintiff's claim of interference is that Local 196 forced Ehredt, who already had a collective bargaining agreement with Local 336, to enter into a collective bargaining agreement with Local 196. The change from Local 336 to Local 196 resulted in a substantial increase in wages that plaintiff was unable to pay due to a previous contractual agreement with Com Ed. Plaintiff was thereby forced to breach its contract with Com Ed.

An unfair labor practice claim brought pursuant to § 8(b)(4)(C) would also inquire into whether Local 196 actually engaged in conduct that forced Ehredt to enter into a collective bargaining agreement with defendant, despite an already existing agreement with Local 336. Although Local 336 had refused to bargain with Ehredt before Ehredt had entered into a collective bargaining agreement with Local 196, the defendant had waged its campaign to organize Ehredt long before the collective bargaining agreement between plaintiff and Local 336 was terminated. This campaign began in the early part of 1988, and escalated to violence in April of 1989. (Plaintiff's First Amended Complaint, ¶ ¶ 38, 39.) Plaintiff's agreement with Local 336, however, was not terminated

until October 31, 1990—nearly two years after Local 196's coercive campaign had begun.

Under both federal labor and state tort law, it is essential for plaintiff to show that Local 196 improperly forced the termination of plaintiff's collective bargaining agreement with local 336 and forced plaintiff to sign an agreement with local 196. Thus, the crucial issue to be litigated under either claim is the same. Therefore, jurisdiction must first lie with the NLRB.

Defendant's conduct is also arguably protected by § 7 of the NLRA. Defendant Local 196's actions were part of an organizing campaign. Organizing campaigns are protected activity under § 7. The NLRB could determine that the action defendant took did not amount to an unfair labor practice, but rather was part of a legitimate organizational campaign and as such is protected activity under § 7.

Plaintiff's state law claim is based on alleged conduct that is arguably concerted activity protected by § 7 and unfair labor practices prohibited by § 8. The proper tribunal to address these complaints is the National Labor Relations Board. Count III of plaintiff's Complaint is, therefore, preempted.

▪ Plaintiff argues that it should be allowed to pursue this claim here because the tort of interference with the right of contract expresses an overriding state interest. The Supreme Court has recognized that preemption may be inappropriate in cases involving conduct that "touche[s] interests so deeply rooted in local feeling and responsibility that ... [it] could not infer that Congress had deprived the States of the power to act." *Garmon*, 359 U.S. at 244, 79 S.Ct. at 779. However, these instances have been limited to cases involving "violence and imminent threats to the public order." *Id.* at 247, 79 S.Ct. at 781. No such issue is involved in plaintiff's Complaint.

Although the Complaint does allege that acts of violence were part of defendant's campaign to force Ehredt to switch local unions, they do not seek recovery for any injuries or property damage as a result of those attacks. Rather, plaintiff's Complaint seeks compensation for economic loss caused by coercion into a collective bargaining agreement with Local 196. "The interest protected [by the tort of interference with the right of contract and prospective advantage] is the reasonable expectation of economic advantage." *Rock Falls*, 300 N.E.2d at 333, 13 Ill.App.3d at 363. The state does not have an overriding concern in regulating economic loss caused by labor disputes. Preemption is appropriate in this matter.

▪ Finally, plaintiff argues that its tort claim should not be preempted because it requests money damages for economic harm—a remedy the NLRB is unable to provide. On the contrary, however, the very fact that the remedies provided by the state and federal law are different demands, rather than prohibits, preemption. The conflict between state and federal law lies not only in the conduct to be regulated but also in the remedies provided. *Garmon*, 359 U.S. at 247, 79 S.Ct. at 781. Congress has already determined what it believes to be the appropriate remedy for defendant's conduct. The plaintiff may not circumvent that remedy by seeking adjudication of its claim under the guise of a state tort claim.[2] Plaintiff's Objection to the Magistrate Judge's recommendation to dismiss Count III is overruled and the conclusion of the Report is adopted.

### III. CONCLUSION

For the reasons stated above, the findings of the Magistrate Judge's Report and Recommendation are accepted. The defendant's motion to dismiss Count II of Plaintiff's First Amended Complaint is denied. The Defendant's motion to dismiss Count III of Plaintiff's First Amended Complaint is granted.

---

2. It should also be noted that pursuant to 29 U.S.C. § 187 plaintiff may bring a claim for damages in the United States District Court against Local 196 for any violations of 29 U.S.C. § 158(b)(4) (1988).